Benny Ray GUTIERREZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–85–288–CR.

Court of Appeals of Texas, Corpus Christi.

April 24, 1986.

———

Armando Cavada, Corpus Christi, for appellant.

George J. Filley, III, Victoria, for appellee.

Before NYE, C.J., and KENNEDY and DORSEY, JJ.

OPINION

NYE, Chief Justice.

Appellant appeals his conviction of involuntary manslaughter for which he was sentenced to nine years' imprisonment and assessed a $5,000.00 fine. The sufficiency of evidence to support the conviction is not questioned. Instead, appellant challenges the admissibility of two confessions he made, and which were introduced before the jury at his trial. We affirm.

Pursuant to a motion to suppress, a hearing was conducted outside the presence of the jury to determine the admissibility of appellant's two written statements.[1] Another such hearing was again had during the course of the trial. The trial court denied the motion to suppress, admitted the statements, and entered findings of fact and conclusions of law.

In his sole ground of error, appellant complains the trial court erred in failing to suppress his confession. Appellant does not argue on appeal that his confession was made involuntarily. He argues that it was the product of an illegal warrantless arrest, and that no attenuating circumstances existed which would serve to purge the taint of the illegal arrest. We find, however, that appellant made these statements prior to the time he was arrested.

A recitation of the facts surrounding the offense and its investigation is necessary. Shortly after 2:00 a.m. on September 1, 1984, the victim, Michael Garza, and four or five others were leaving the Zodiac Lounge in Victoria, Texas. The owners of the lounge were in the process of closing for the night. Michael Garza was standing in the parking lot near the front door talking to another man. One of those present testified he heard a "popping" noise like a "firecracker" or a "tire blowout." He said he saw a car pass by at the time he heard the noise. He then saw Michael Garza lying on the ground. He could barely see the car and could only describe it as "small" and "dark." The man with whom

the victim had been talking testified he heard a noise "like a gunshot" and saw a small dark car "like a Pinto." He also saw the victim fall to the ground. The victim died due to a gunshot wound to the chest.

This was basically the extent of the information known by the police until March 7 or 8, 1985, when appellant's wife gave a statement to police implicating appellant in the crime. Appellant's wife also told the police that appellant worked for a construction company in Goliad, Texas. The investigating officers then visited appellant at his job-site.

According to appellant, who testified at the suppression hearing and at trial, the officers spoke to appellant's boss, who called appellant over to speak with the officers. Appellant stated that Tucker, one of the investigating officers, requested that he accompany them "to the station because [they had] to ask [him] some questions." Appellant asked if he was in any trouble, and he testified that Tucker answered, no, that they only wanted to ask him some questions. When the court asked appellant whether he agreed to go with them to the sheriff's office, appellant answered: "Yeah, I told them—I told him yeah, let's go, I guess so. They told me 'you want to come?' and I said yeah. I left and they told me to go in that other car." Appellant also stated that he was not handcuffed.

Tucker testified that he did not have a warrant of arrest at the time he went to the job-site because "[n]ot enough evidence was present." Tucker stated that appellant was free to leave and free not to talk to them.

Sergeant Tucker also gave the following testimony. Tucker and Arrizola accompanied appellant into the sheriff's office. Tucker immediately advised appellant of his rights in satisfaction of *Miranda* and TEX.CODE CRIM.PROC.ANN. art. 38.22, § 2 (Vernon 1979).[2] Tucker explained that he was investigating the death of Michael Garza and that their investigation had

---

**1.** *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); TEX.CODE CRIM. PROC.ANN. art. 38.22, § 6 (Vernon 1979).

**2.** *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

shown that he was a suspect. When asked how it was shown, Tucker answered that he told appellant it was through statements they had gathered. Tucker did not tell appellant the statements were from his wife until after appellant confessed. Then Tucker opened the case folder and asked appellant if he wanted to talk, and appellant said he had nothing to hide. Tucker asked him about his trip to Victoria and about "certain places in Victoria." Some ten to fifteen minutes into the questioning, appellant leaned back in his chair and said, "I did it, I don't know why I did."

Appellant then told the officers about the incident. The conversation with appellant began at 11:25 a.m. and ended at 12:38 p.m. Tucker typed out appellant's statement and attached it to a form containing the *Miranda* warnings. Appellant was given a copy of both. They were read aloud to him. He signed both sheets, with Tucker and Arrizola witnessing his signature.

Because of the many typographical and spelling errors, Tucker requested that Arrizola retype appellant's statement. This second statement was not substantively different from the first except that information about appellant stopping at a gas station was added. The statement was attached to another *Miranda* form. Appellant was given a copy of each, they were read to him again, and he signed both. This time Arrizola and another deputy witnessed appellant's signature. The second statement reads as follows (initials represent those of appellant):

> About 6–8 months ago, right around the 1st. of September, 1984, me and my wife Mary, were living in Beeville, Texas, with my parents. I asked my dad if I could borrow one of his cars. It is a compact blackish-green 4-door Pontiac. I wanted to takeMary [sic] (B.G.) to Roberto's in Victoria Texas. My dad said I could borrow the car. A few hours later, me and Mary got into an arguement [sic]. I got mad and left by myself. I took my dad's Pontiac and headed to Victoria. I stopped in Goliad, Texas and bought some acid from a guy named Carlos. I had been f [sic] (B.G.) drinking Seagram Seven and coke since I left Beeville.

> When I got out of Goliad city limits I took the acid. I got into Victoria about 7:00 P.M. I went straight to Roberto's and started drinking Seagram Seven and coke. I don't remember how may [sic] I had but it was alot. I met this girl named Elizabeth. She said she was from Edna. We hit it off and left together about 10:00P.M. and went to Motel Six and had sex. We were smoking marijuana and drinking. I was really loaded. I drove Elizabeth home to Edna and then star(t)ed (B.G.) driving to Beeville. I was driving through Victoria when I saw the Zodiac lounge. I don't know why, but I wanted to shoot at the building. I didn't see anybody around. I remember my dad left a .22 pistol under the front seat. I slowed down and took the pistol, pointed it at the building, and started shooting. I (kept) (B.G.) shooting until the pistol was empty. I looked over and saw this guy fall down by the front door. I didn't see him before. I took off and went straight home. I stopped at Billups Service Station to gas up before continuing to Beeville. I told my dad about three weeks later of what happen. Dad tried to get me to turn mayself in but I didn't. I think dad sold the pistol I used in the shooting. No one has harmed, threaten or promised me anything in exchanged for this statement.

Due to the similarities between the confessions, only the latter has been reproduced here. After appellant's confession, he was formally arrested and charged with involuntary manslaughter in causing the death of Michael Garza by discharging a firearm at the premises occupied by the victim.

It is undisputed that when the officers went to appellant's job-site they did not have probable cause to arrest him and probable cause did not arise until after appellant's confession. Circumstances did not exist which would excuse the warrant requirement. *See* TEX.CODE CRIM. PROC.ANN. arts. 14.01, *et seq.* (Vernon 1977). Appellant brings his challenge under the fourth amendment and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He argues that

he was illegally arrested at his job-site and was in custody when he made his confession. Appellant cites *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). He argues the admission of his confession was an exploitation of his illegal arrest.

In its *Brown v. Illinois* line of cases, the United States Supreme Court has disapproved arrests made for investigatory purposes on less than probable cause. In *Brown*, the Court focused on the causal connection between an illegal arrest and a confession, and identified factors to be considered in determining whether this causal connection has been sufficiently attenuated so as to purge the taint of an illegal arrest. *Dunaway v. New York*, 442 U.S. at 217–18, 99 S.Ct. at 2259. That a confession was voluntary under the fifth amendment is merely the threshold requirement in the fourth amendment analysis. *Id.* at 217, 99 S.Ct. at 2259.

The cases cited by appellant are factually distinguishable from the instant case. The petitioners in *Taylor, Dunaway,* and *Brown*, were all "involuntarily" taken to police stations for questioning. In *Brown*, the petitioner was stopped at gunpoint as he entered his apartment, told he was under arrest, handcuffed, placed in a squad car, taken to the police station, warned of his rights, and interrogated. He then made inculpatory statements. 422 U.S. at 592–97, 95 S.Ct. at 2256–58. The arrest was made for investigatory purposes and without probable cause. In *Taylor*, the petitioner was implicated in a robbery by an informant. Without a warrant, the police arrested him, searched him, and told him that he was under arrest in connection with a robbery. He was taken to the police station, fingerprinted, questioned, and placed in a line-up.

In *Dunaway* the defendant was not formally arrested before he confessed; however, the court held that the circumstances surrounding the police contact with the petitioner were indistinguishable from a formal arrest and amounted to a seizure of his person under the fourth amendment.

The facts in *Dunaway* and the facts in the case before us are clearly distinct. In *Dunaway*, an informant implicated the petitioner in a robbery, and although there was not enough information to get a warrant, the petitioner was picked up and brought in for questioning. Petitioner was "taken into custody" at a neighbor's house, and "although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave." These facts amounted to an involuntary investigatory detention. The Court noted its holding in *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), that anytime a police officer restrains a citizen's freedom to walk away, that citizen has been "seized."

Here, the evidence shows that appellant was asked to come to the police station to answer some questions. He was told about the incident the police were investigating. There was no show of force and he was not restrained in any way. Appellant himself stated that he agreed to go with the officers and voluntarily made a statement.

In *Galitz v. State*, the Court of Criminal Appeals, in considering a search and seizure question, held:

> It is only when a person chooses not to be questioned, or remains in submission to a show of force, that the officer's insistence on questioning that person becomes a "seizure" subject to the constraints of the Fourth Amendment (Citations omitted). We hold that appellant's agreement to converse with the officers outside the ... Club renders the *Terry* line of cases inapposite.

617 S.W.2d 949, 957 (Tex.Crim.App.1981).

The facts in the present case regarding appellant's confession are similar to the facts in *Sutton v. State*, 644 S.W.2d 506 (Tex.App.—Eastland 1982, pet. ref'd). In *Sutton*, the defendant was convicted of murder after the jury was allowed to consider her confession. She argued the confession was the product of an illegal arrest and was thus tainted. The defendant had

gone to the police station at the request of a deputy sheriff. She was told they were investigating the death of a child. She drove her own car to the station. The officers involved testified that she was not under arrest and would have been free to leave had she not wanted to go with them. She accompanied the officers into a room where she was given her *Miranda* warnings. After a brief discussion, the defendant "ducked her head and started crying." The officers took her to a magistrate for more warnings. They returned to the room where the officers took her voluntary statement. The distinguished Eastland Court of Appeals held that she "was not under an illegal arrest when she gave the 'voluntary statement.'" *Id.* at 507; *see also Clark v. State*, 627 S.W.2d 693, 700 (Tex.Crim.App.1981); *Stone v. State*, 583 S.W.2d 410, 413 (Tex.Crim.App.1979); *see also Shiflet v. State*, No. 812–82 (Tex.Crim. App. October 9, 1985) (not yet reported).

The Court of Criminal Appeals, in *Shiflet*, in considering "custody" within the meaning of the fifth amendment, recently stated:

> We are unaware of any rule of law which forbids lawfully constituted officers of the law from requesting persons to accompany them, or of providing transportation to the police station or some other relevant place in furtherance of an investigation of a crime. Nor are we aware of any rule of law that prohibits police officers from voluntarily taking a person to the police station or some other relevant place in an effort to exonerate such person from complicity in an alleged crime. Nor are we aware of any rule of law which forbids one to reject such request. If the circumstances show that the transportee is acting only upon the invitation, request, or even urging of the police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not then in custody. In other words, under those circumstances, such person has not "been taken into custody or otherwise deprived of his

freedom of action in any significant way." *Miranda v. Arizona,* supra. *Shiflet v. State,* at 11.

Findings of fact and conclusions of law made by a trial court should not be disturbed absent a clear abuse of discretion. Looking at the totality of the circumstances, we find there is more than ample evidence to support the trial court's finding that appellant was not arrested or restrained prior to making the inculpatory statements and that these statements were voluntarily made.

Appellant's ground of error is overruled and the judgment of the trial court is AFFIRMED.

DORSEY, J., concurs.

DORSEY, Justice, concurring.

Five law enforcement officers went to appellant's job site to see if he would voluntarily accompany them to answer some questions concerning a homicide. The officers consisted of two from Victoria County, Tucker and Arrizola, who were actually conducting the investigation, and three from Goliad County, the county in which the appellant's job site was located. The appellant was employed rebuilding a highway some distance outside the city of Goliad.

The issue is whether the appellant was seized in the context of the Fourth Amendment to the United States Constitution, or whether he accompanied the officers voluntarily to the Sheriff's Department where he was interviewed. The Supreme Court of the United States in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) stated:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers,

the display of a weapon by an officer, some physical touching. of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officers' request might be compelled. [citations omitted]

The appellant did not testify that he felt any compulsion to accompany the officers, and there was no evidence of the appellant's attempting to leave at any time or of any restraint or intention to restrain the appellant by the officers. I cannot say that the presence of the five officers, standing alone, would have lead a reasonable person to believe that he had been seized for Fourth Amendment purposes. *See Gregg v. State*, 667 S.W.2d 125 (Tex.Crim.App. 1984). I concur with the decision reached by the majority of the panel.